**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| THE BIG 12 CONFERENCE, INC., a Delaware corporation, <br><br> *Plaintiff*, <br><br> *v.* <br><br> WARREN KENNETH PAXTON JR., in his official capacity; TEXAS TECH UNIVERSITY; TEXAS TECH UNIVERSITY SYSTEM; CHANCELLOR BRANDON CREIGHTON, in his official capacity; PRESIDENT LAWRENCE SCHOVANEC, in his official capacity, and ATHLETIC DIRECTOR KIRBY HOCUTT, in his official capacity <br><br> *Defendants*. | Case No. |

## COMPLAINT

Plaintiff The Big 12 Conference, Inc. ("Big 12" or "Conference"), brings this action against Attorney General of the State of Texas, Warren Kenneth Paxton Jr., in his official capacity; Texas Tech University ("TTU"); Texas Tech University System; Chancellor of the Texas Tech University System, Brandon Creighton, in his official capacity; President of Texas Tech University, Lawrence Schovanec, in his official capacity; and Athletic Director of Texas Tech University, Kirby Hocutt, in his official capacity seeking declaratory and injunctive relief.

### INTRODUCTION

1.      The Big 12 Conference and its member schools, including Defendant Texas Tech University ("TTU"), have long recognized and spoken out about the dangers of unethical and illegal sports betting by student athletes. So too has the Texas Attorney General. Indeed, TTU has gone further than the Big 12 itself by making student gambling a ground for probation or expulsion

from TTU, and the State of Texas prohibits sports betting outright and criminalizes it, with the Texas Attorney General even having faced suit because of limitations the State has placed on the practice.

2.     TTU and the Texas Attorney General have now threatened the Big 12 with suit given the prospect that the Big 12 will continue to express precisely these values that one would have understood all parties to this suit to have shared. Recently, an investigation revealed that a current TTU student-athlete placed numerous impermissible (and often illegal) bets on various collegiate athletic competitions while on the football teams of two prior universities, including 40 bets on his own teams' games. In response to TTU's intent to field that student-athlete in Big 12 competitions this upcoming football season, several Member Institutions began raising questions about whether the Conference could vote on potential sanctions against TTU—consistent with the explicit, broad, and highly discretionary sanction authority set forth in the Conference Bylaws— in the event TTU ultimately does decide to field the student athlete in Big 12 games this fall.  As a result, the Texas Attorney General and TTU threatened the Big 12 with suit. The threatened suit would prevent the Big 12 from exercising its rights under its Bylaws and the First Amendment— by seeking to disassociate from and decline to endorse the willingness of one of its Member Institutions to condone, if not tacitly endorse, the sports gambling of one of its players.

3.     The Big 12 now brings this declaratory and injunctive action to vindicate its rights, including its constitutional rights under the First Amendment. The Big 12 and its Member Institutions (apparently save TTU) have no interest in being required to endorse or even appearing to endorse unethical and indeed unlawful conduct that strikes at the heart of athletic integrity. Instead, the Big 12 seeks declaratory and injunctive relief that will permit it to exercise its rights in full and leave no doubt in the minds of its many other upstanding student-athletes, its potential

**COMPLAINT**                                                                                                          **Page 2**

future student-athletes, its rival athletic conferences and their member institutions, and the general public of exactly where it stands on an important moral, ethical, and legal issue.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over the claims based on the First Amendment, Sherman Act, and Commerce Clause under 28 U.S.C. § 1331 because they arise under the Constitution or laws of the United States.

5.     The Court has subject-matter jurisdiction over the claims based on Texas law under 28 U.S.C. § 1367 because they "derive from a common nucleus of operative fact" with the federal claims and thus are so related as to form part of the same case or controversy. *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 206 (5th Cir. 2018) (quoting *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008)).

6.     Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(1) because one or more of the defendants resides in the District and all defendants reside in the State of Texas.

## PARTIES

7.     Plaintiff The Big 12 Conference, Inc. ("Big 12" or the "Conference") is a 501(c)(3) non-profit membership organization and collegiate athletic conference made up of sixteen institutions of higher education from ten different states: University of Arizona, Arizona State University, Baylor University, Brigham Young University, University of Central Florida, University of Cincinnati, University of Colorado, University of Houston, Iowa State University, University of Kansas, Kansas State University, Oklahoma State University, Texas Christian University, Texas Tech University, University of Utah, and West Virginia University (the "Member Institutions"). The Big 12 is a corporation organized under Delaware law and headquartered in Irving, Texas.

8. Defendant Warren Kenneth Paxton Jr., commonly known as Ken Paxton, is the Attorney General of the State of Texas. He is sued only in his official capacity.

9. Defendant Texas Tech University is a public university organized under Texas law and located in Lubbock, Texas.

10. Defendant Texas Tech University System is a public university system organized under Texas law and headquartered in Lubbock, Texas. Texas Tech University is one of the System's member universities.

11. Defendant Brandon Creighton is Chancellor of the Texas Tech University System and has been delegated the responsibility to manage and operate the Texas Tech University System and component institutions such as Texas Tech University. The Chancellor has direct responsibility for all aspects of Texas Tech University System operations. Defendant Creighton is named only in his official capacity.

12. Defendant Lawrence Schovanec is President of Texas Tech University. He is named only in his official capacity.

13. Defendant Kirby Hocutt is Athletic Director of Texas Tech University and is responsible for the development, management, coordination and supervision of the Texas Tech University athletics program. He is named only in his official capacity.

14. This complaint may refer to Texas Tech, the System, Chancellor Creighton, Athletic Director Hocutt, and President Schovanec simply as "TTU."

## FACTUAL ALLEGATIONS

### The Role of Athletic Conferences in Intercollegiate Athletics

15. Intercollegiate athletic competition in the United States is facilitated through the operation of athletic conferences. Athletic conferences are independent associations of member institutions that facilitate, coordinate, and govern athletic competition among their members.

Conferences establish schedules, administer regular-season competition, determine championship qualification and participation requirements, organize and conduct conference championship events, negotiate conference-wide media rights agreements, distribute conference revenues, enforce conference rules and policies, and protect the competitive integrity of conference competition.

16.     A single university cannot, acting alone, produce the organized competition, shared championship, and recognized brand that constitute the commercial and institutional product of major college sports, particularly college football. That product requires cooperation among competing institutions: agreement on a shared schedule, common rules for games, teams, and players, unified officiating standards, joint media rights arrangements, and a collaborative championship structure. The Big 12 Conference exists precisely to provide that framework.

17.     The Big 12 has existed for 30 years as one of the nation's premier collegiate athletics conferences, with sixteen member universities competing across twenty-five different sports. It is a member conference of the National Collegiate Athletic Association ("NCAA") and all of its members hold Division I membership in the NCAA; but the Big 12 is a separate legal entity with its own interests that is governed by its own governing documents and administered by its own Board of Directors and Commissioner. The Big 12 exercises independent authority on behalf of its Member Institutions with respect to matters committed to Conference governance.

18.     In football, Big 12 member institutions play twelve regular season games, nine of which are interconference games that culminate in the Big 12 Championship Game, which determines the Conference champion and determines the College Football Playoff representative for the Conference. The sixteen member institutions compete fiercely throughout the season for a spot in the Big 12 Championship Game and for a chance to become the Conference champion.

19.     The Conference holds media rights agreements worth billions of dollars through the 2030-31 academic year. The legitimacy of Big 12 competitions—and the value of its brand and media rights—depends on public confidence that the results of Big 12 games are genuine. That confidence would be significantly undermined if member institutions were permitted to compete for Conference championships with players who had gambled on the outcomes of their own team's games.

<strong>The Big 12 Conference's Governance Structure and Bylaws</strong>

20.     The Big 12 was incorporated as a nonprofit organization in June of 1995. According to its Amended and Restated Certificate of Incorporation, which is attached hereto as Exhibit 1, the Big 12 was organized to "control and regulate intercollegiate athletics as institutional activities, to encourage sound academic practices for student-athletes and to establish harmonious intercollegiate relationships among member institutions."

21.     To make it possible for the Big 12 to fulfill these purposes, the Big 12's Bylaws provide for broad rulemaking and enforcement authority to be exercised by the Conference, through its Board of Directors, authorized committees, and officers.

22.     The Big 12's Bylaws—which were last amended on May 30, 2025 by a unanimous vote by all the Presidents or Chancellors of Member Institutions, including TTU—are set forth in the Conference Handbook, which is attached hereto as Exhibit 3.

23.     As set forth in Bylaws 1.2.4-1.3, all Member Institutions must "support the mission of the Conference," which is to "[a]dvance standards of scholarship, sportsmanship and equity consistent with the highest ideals of Conference membership;" "[s]upport the development of national-championship caliber intercollegiate athletic programs;" "[o]rganize, promote and administer intercollegiate athletics among its member institutions;" "[o]ptimize revenues and provide supporting services compatible with both academic and competitive excellence;" and

"[e]ncourage collaboration in areas beyond athletics that builds good-will between institutions and promotes the overall missions of the universities."

24.     The Conference is governed by a Board of Directors (the "Board") consisting of the most senior executive officer for each Member Institution (the President or Chancellor). The Board has broad authority to "take action on any matter in accordance with these Bylaws" by an affirmative vote of either a majority or supermajority of disinterested directors, depending on the matter at issue.

25.     One of the actions the Board is authorized to take by a vote of a Supermajority[1] of Disinterested Directors is to sanction a Member Institution. Under Bylaw 3.6—which was approved in its current form by the Board on May 31, 2013—a Supermajority of Disinterested Directors has broad authority to sanction a Member Institution, as long as the Member is given "reasonable prior notice and the reasonable opportunity to be present and to be heard" before a vote takes place.

26.     After a Member has had an opportunity to be heard, a Supermajority of Disinterested Directors has the authority pursuant to § 3.6 of the Bylaws, "in its sole discretion," to sanction the Member if it determines that the Member has:

    i.   "violated any provision of these Bylaws or the Rules and other regulations established from time to time by the Board of Directors that govern the Conference or the Grant of Rights Agreement;"

    ii.   "engaged in any action or course of conduct materially adverse to the best interests of the Conference taken as a whole;"

    iii.   "taken or omitted to take any other action that could be the basis for Withdrawal as described above if a Supermajority of Disinterested Directors does not elect to deem the action to constitute a deemed Withdrawal at that time;" or

---

[1] All capitalized terms that are not otherwise defined herein should be given the definition set forth in the Conference Handbook attached as Exhibit 3.

iv.    "otherwise taken any action or omitted to take an action that a Supermajority of Disinterested Directors determines merits Sanctions."

27.    These grounds for sanctions are intentionally broad and are not limited only to rules violations (and any contrary interpretation would eliminate every basis for sanctions other than the first subparagraph). They authorize the Board to exercise institutional judgment about whether a Member Institution's actions—including its decisions about which student-athletes to field in Conference games and what those decisions signal about the Member's commitment to Conference values and what they cause the public to perceive about the Conference's own values—is compatible with the Conference's interests. The Board does not need to address the issue of whether a student-athlete has violated a specific rule. It needs only to find that the Member Institution's decision is materially adverse to the Conference's best interests or that the conduct otherwise merits sanctions. That is a governance determination, not a rules-enforcement determination, and it is exclusively the Board's to make.

28.    If a Supermajority of Disinterested Directors determines that any of the grounds exist to sanction a Member, the Bylaws, § 3.6, empower the supermajority "in its sole discretion" to determine "whether any sanctions are appropriate, the type, extent, and conditions to any sanctions imposed, and impose such sanctions in a Member depending, in each case, on factors that a Supermajority of Disinterested Directors deems to be relevant, including but not limited to the severity of the harm to the Conference taken as a whole resulting from the action or inaction" of the Member. In a non-exhaustive illustrative list of exemplar sanctions that can be imposed, the Bylaws identify "prohibitions on appearance in postseason events or televised events" (such as conference championships) and "restrictions on revenue distributions."

29.    Section 5 et. seq. of the Bylaws set forth the Conference Rules. All Big 12 Members agree in Bylaw 1.3.2 to fully comply with "NCAA rules and policies" and all "rules and regulations

of the NCAA and of the Conference." On matters of student-athlete eligibility, the Conference Rules, set forth in Section 6 of the Bylaws, incorporate the NCAA requirements and specify additional rules on top of those. In addition to the sanctions authority of the Board, Bylaw 7.4 also authorizes the Conference Commissioner to sanction Member Institutions when an ineligible student-athlete participates in Conference competitions where there is "an egregious violation of a Conference Rule" or "a violation of an NCAA rule involving institutional culpability that is not subject to the jurisdiction of the NCAA Committee on infractions." As noted above, however, the Board's sanction authority does not have any such limitations and is not even required to be tied to a rules violation.

30.     The Conference's sanctioning authority under these provisions is an exercise of governance power conferred by an interstate contract among the Conference and its Member Institutions across the country. As a founding member of the Conference, Defendant TTU not only agreed to this governance structure and sanction authority, as detailed in the next subsection, TTU helped set it up and has repeatedly voted in favor of this authority and in favor of requiring all members abide by it. TTU's acceptance of the Conference's governance documents—including the provisions granting the Conference authority to withhold distributions and exclude Member Institutions from championship competition—is what entitles TTU to receive those distributions and participate in that competition in the first place.

### TTU Recognized and Supported the Conference Board's Prior Exercise of Its Sanction Authority Against Another Member Institution

31.     The Conference's authority to sanction member institutions under its Bylaws is well established and has been a historical practice in which its member institutions, including TTU, have participated.

32.     For instance, in May 2016, the Board of Regents of Member Institution Baylor

University publicly released a set of 105 recommendations (the "Recommendations") and a document titled "Findings of Fact," both of which arose out of an investigation by outside counsel into a series of sexual assault allegations that occurred at Baylor during the years 2012 through 2015 and Baylor's response to those allegations. Of particular significance from the Conference's standpoint, the Findings of Fact concluded that "Baylor failed to maintain effective oversight and supervision of the Athletics Department as it related to the effective implementation of Title IX" and that such failure "created a cultural perception that football was above the rules."[2] The severity of these failures led to extensive media coverage and reputational concerns, including for the Conference itself, as well as termination of Baylor's President, Athletics Director, and head football coach.

33.    The Conference expressed concern to Baylor about reputational damage to the Conference, as well as a violation of Conference Bylaws. In February 2017, the Board determined that sanctions were warranted. As authorized by Section 3.6, the Board imposed sanctions on Baylor by withholding 25% of Conference revenue distributions from February 2017 until the Board determined that Baylor rectified its institutional issues and came back into compliance with the Conference Bylaws and regulations. As publicly announced at the time by the then-Board Chairman, "The Board is unified in establishing a process to verify that proper institutional controls are in place and sustainable. Effective immediately, the Conference is withholding 25 percent of Baylor's share of any future revenue distribution until the proper execution of controls is independently verified."[3] The Board of Directors voted unanimously to impose these sanctions.

---

[2]    Baylor University Board of Regents, *Findings of Fact*, 9–10, https://thefacts.web.baylor.edu/sites/g/files/ecbvkj1406/files/2023-01/FINDINGS%20OF%20FACT.pdf.
[3]    *Big 12 Board Action Announced*, Big12Sports.com (Feb. 8, 2017) https://big12sports.com/news/2017/2/8/211461596.aspx.

**COMPLAINT**                                                                 **Page 10**

Baylor was not included in the Board vote and was responsible for all associated costs, which were taken out of any of its revenue distributions from the Conference. At the conclusion of the verification process, the Conference had withheld over $14 million in revenue distributions from Baylor, with over $1.6 million of that immediately being applied to reimburse the Conference for legal costs. The remaining withheld amount was invested for 48 months, with net earnings being distributed to the Member Institutions to, among other things, fund sexual harassment training. At the end of those 48 months, the Conference held back at least a $2 million fine "for reputational damage to the Conference and its members."[4]

34.   TTU participated in and supported the Conference Board's unanimous vote to sanction Baylor. TTU's representative on the Board of Directors voted in favor of the resolutions imposing these sanctions. TTU raised no objection to the Conference's authority under Section 3.6 of the Bylaws to sanction a member institution for conduct that the Conference Board determined warranted sanctions.

35.   The Conference further exercised its authority by retaining an outside law firm to conduct an independent verification of whether Baylor had completed and implemented the Recommendations in a manner sustainable over time. The Board appointed an oversight committee consisting of the presidents and chancellors of three Member Institutions to oversee the verification process. The verification involved the review of hundreds of documents, dozens of in-person and telephonic interviews, and a comprehensive evaluation of Baylor's compliance with the Recommendations. Throughout this process, no Member Institution, including TTU, challenged the Conference's authority to impose and enforce the sanctions, oversee the verification, or condition the release of withheld revenue distributions upon demonstrated compliance.

---

[4] https://big12sports.com/news/2018/10/30/211778185.aspx

**COMPLAINT**                                                                                         **Page 11**

36.    The Attorney General's and TTU's apparent current position—that the Conference lacks authority under its Bylaws to sanction a member institution whose conduct the Conference Board determines to be sanctionable under Bylaw 3.6—is directly contradicted by TTU's own prior conduct. The Baylor sanctions demonstrate that the Conference has previously exercised precisely the type of sanction authority it now seeks to invoke, and that TTU itself voted to authorize and impose those very sanctions without objection.

### The Big 12's Commitment to Competition Integrity as Related to Sports Wagering is Longstanding and Consistent with Industry-Wide Values

37.    The threat that gambling poses to the integrity of athletic competition has been understood—and has been borne out by scandal—for over a century. That history informs the Conference's values and governance practices and explains why these values are non-negotiable.

38.    In 1919, members of the Chicago White Sox conspired with gamblers to intentionally lose the World Series, in what became known as the "Black Sox" scandal. Although several players were acquitted at trial, Commissioner Kenesaw Mountain Landis banned all the implicated players from baseball for life. The Black Sox scandal demonstrated that the perception of gambling corruption is as destructive to the legitimacy of athletic competition as confirmed manipulation: once the public suspects that a game's outcome may have been purchased or that athletes play with any competing incentives to the ones they ordinarily have, confidence in all games is impaired.

39.    Thirty years later, college basketball suffered its own catastrophic gambling scandal. Beginning in 1950, gamblers systematically bribed players at City College of New York, Long Island University, Manhattan College, New York University, Bradley University, the University of Toledo, and the University of Kentucky (the reigning NCAA champion) to shave points and control game outcomes. The 1951 college basketball point-shaving scandals resulted in

criminal convictions, player imprisonments, and the permanent tarnishing of the programs involved. The reputational harm lasted for generations. The lesson drawn by collegiate athletics, and reflected in the NCAA's longstanding Bylaw 10.3 prohibition on student-athlete wagering, was that the danger of gambling to the integrity of competition is systemic, and must be addressed at the institutional level.

40.    In 1989, Major League Baseball Commissioner A. Bartlett Giamatti permanently banned Pete Rose—widely regarded as one of the greatest players in baseball history and then the all-time hits leader—from the sport for betting on games involving his own team while serving as the Cincinnati Reds' manager. Rose's case confirms a principle that the Conference has adopted as its own: an athlete or coach who bets on games in which his own team competes—even if he bets on his team to win—creates an irremediable conflict of interest and hurts both the integrity and, just as important in a consumer-facing industry, the *perceived integrity* of the competition. The possibility that the athlete might use insider information in betting, persuade his teammates to one course of action over another, or perform differently in situations that affect his wager cannot be eliminated, and the public knows it.

41.    Collegiate athletics in more modern years is not immune from these issues. In 1994 and 1995, players at Northwestern University were found to have bet on their own games and, in some instances, to have intentionally performed below their ability. Likewise, in January of this year, charges were brought against twenty-six college athletes involved in a bribery and point-shaving scheme to fix NCAA men's basketball games during the 2023-2024 and 2024-2025 seasons. Players from Fordham University, Tulane University, Kennesaw State University, and Alabama State University, among others, were offered between $10,000 and $30,000 per game to ensure that their team would fail to cover the spread, allowing the orchestrators of this scheme to

place millions of dollars in wagers. Notre Dame University suspended its entire men's swimming program in 2024 as a result of betting that athletes in that program had placed on Notre Dame's own competitions.

42.     Similar scandals involving student-athlete wagering have recurred periodically, demonstrating that the risk is systemic, not isolated. Each recurrence has reinforced the principle that institutions which take a firm stance against wagering—and enforce consequences for it— protect the integrity that makes these competitions worth watching.

43.     Notably, although many states have legalized sports betting, Texas has not. Under Texas Penal Code section 47.02(a)(1), a person commits the offense of gambling if he or she makes a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest. The State of Texas has made the same institutional judgment, as a matter of law, that the Conference has made as a matter of governance: that sports wagering is incompatible with the public interest. The Conference and the State of Texas are, at the level of institutional principle, in agreement that sports wagering by those participating in athletic competition is wrong.

44.     The Conference has adopted and actively enforces these values as its own. The Conference's Sports Betting Policy, adopted August 17, 2023 (the "Sports Betting Policy") (attached as Ex. 2), states: "The Big 12 Conference is committed to maintaining the integrity of the Big 12 competitions and that of its members, student-athletes, coaches, and staff." The Policy further recognizes that "[s]ports wagering has the potential to undermine the integrity of sports competitions and jeopardize the well-being of student-athletes and the intercollegiate athletics community. It also demeans the competition and competitors alike by spreading a message that is contrary to the purpose and meaning of 'sport.'"

45.     When the Conference and its Member Institutions expanded their partnership in 2023 with U.S. Integrity (a sports wagering monitoring company), Conference Commissioner Brett Yormark stated upon announcement of the expanded partnership: "The Big 12 Conference is thrilled to partner with U.S. Integrity as a continuation of its commitment to sports betting compliance. Given the current landscape of sports betting in our industry, it's more important than ever to double-down on ensuring sport integrity across our Conference."

46.     The Conference's concerns related to sports betting are not limited to confirmed manipulation. The history of gambling scandals demonstrates that the presence of athletes with a financial stake in game outcomes creates a structural conflict of interest that undermines the integrity of competition regardless of whether active manipulation is proven. An athlete with an extensive, documented history of wagering on intercollegiate athletic contests—especially his own team's games—presents a reputational and integrity risk to the Conference and its championship competition that the Conference has both the right and the responsibility to address. The Conference is not required to accept that risk on behalf of its fifteen other Member Institutions, their student-athletes, their fans, and its commercial partners. And no government official has the power to compel it to do so.

### Brendan Sorsby Admitted Extensive Sports-Wagering Conduct That Is Illegal and Contrary to the Big 12's Values

47.     Brendan Sorsby ("Sorsby") is a student-athlete who enrolled at TTU in January 2026 to play on the TTU football team. He was previously enrolled and on the football teams at Indiana University in 2022 and 2023, and at the University of Cincinnati, a Member Institution, in 2024 and 2025.

48.     In connection with a recent litigation not involving the Conference—*i.e.*, the Lubbock County Litigation (defined and explained below)—Sorsby and TTU submitted stipulated

facts concerning Sorsby's sports-wagering activity. Those facts show that Sorsby's conduct was not merely contrary to Conference values and rules and NCAA rules; it also included extensive sports-wagering activity prohibited by multiple states' laws.

49.     Specifically, Sorsby admitted that he used online betting and prediction applications, including Hard Rock Bet, FanDuel, Underdog, and PrizePicks, through accounts registered in his own name and in the names of others to place impermissible wagers on college and professional sports. Sorsby admitted he made at least $90,000 in impermissible wagers under his name and that he transferred at least $60,000 to another person to place bets on his behalf. Significantly, Sorsby admitted to placing bets on his own team's games while at Indiana.

50.     While on the Indiana University football team, Sorsby placed at least 2,900 bets totaling more than $30,000. Those bets included at least 40 wagers on Indiana University football or the performance of individual Indiana University football players (his teammates), at least 50 wagers on Indiana University men's basketball or the performance of individual Indiana University men's basketball players, and approximately 300 wagers on other college football contests or collegiate player performances.

51.     Notably, at the time he was placing bets in Indiana, Sorsby was under twenty-one years old, thus seemingly making his bets a violation of Indiana law prohibiting a person under twenty-one from making a sports wager. Ind. Code § 4-38-5-11.

52.     Sorsby admitted that while he was playing football at the University of Cincinnati (a Member Institution), he provided more than $60,000 to another individual to deposit in a FanDuel account registered to someone else, which was accessed and shared by Sorsby and another person to place bets. Between January 7, 2024 and September 30, 2024, Sorsby placed at

least 165 bets on college and professional sports totaling at least $38,000. Sorsby also placed bets on the performance of Cincinnati men's basketball team and individual members of the team.

53.    Ohio law permits online sports wagering only for individuals who are at least twenty-one, physically present in Ohio, and using compliant sports-gaming accounts. Ohio Rev. Code § 3775.11; Ohio Admin. Code 3775-16-03. Moreover, Ohio law does not allow individuals to access or use another person's sports gaming account. *Id.* Sorsby was under twenty-one for part of his admitted time period for placing bets in Ohio, used or helped fund a FanDuel account registered to another person, accessed and shared that account to place bets, and transferred money for wagering activity. Thus, Sorsby's admitted conduct (presuming any of it took place in Ohio), in addition to being contrary to the rules and stated values of the Big 12 Conference—of which his then-current university is a member—also violated Ohio state law.

54.    After enrolling at TTU to join its football program in January 2026, Sorsby continued to place sports bets through accounts belonging to others. He admitted to sending approximately $5,000 by Venmo or Zelle to another person, who then used the money to place bets on Sorsby's behalf through Underdog, PrizePicks, or Chalkboard. Sorsby admitted his betting activity was "similar to his prior activity."

55.    In addition to being contrary to the rules and stated values of the Big 12, Sorsby's TTU-period wagering violated Texas's criminal gambling prohibitions because Texas Penal Code § 47.02 makes it an offense to bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest. Notably, Attorney General Paxton's own Opinion KP-0057 takes the position that Texas's gambling prohibitions apply even to paid fantasy-sports and prediction-style contests. Ken Paxton, Att'y Gen. of Tex., Op. No. KP-0057, *The Legality of Fantasy Sports Leagues Under Texas Law (RQ-0071-KP)* 7 (Jan. 19, 2016)..

56.     In addition to violating the laws of three states, Sorsby's conduct contravenes core Big 12 ethical principles.

57.     Big 12 competition depends on the trust of its Member Institutions, student-athletes, fans, and broadcast partners in the integrity of Big 12 games. It is critical to both the Big 12's values, reputation, and even financial well-being that these interested parties maintain their belief that Big 12 games are decided by fair athletic performance, particularly where Conference games determine standings, postseason opportunities, championship eligibility, and the public reputation of The Big 12 and its member institutions.

58.     Student-athlete gambling on college sports, especially bets involving the athlete's own team and teammates' performances, undermines the public's confidence that contests are free from wagering influence. Thus the Big 12 is concerned with TTU's stated plans—communicated by TTU to the Conference and now backed by independent threats from the Attorney General—to field a student-athlete in Conference competitions despite admitted wagering conduct that is both illegal and in direct conflict with the ethical standards and public trust on which Big 12 competition depends.

## The Lubbock County Litigation

59.     On May 18, 2026, Sorsby filed suit against the NCAA in the 99th Judicial District Court of Lubbock County, Texas, Cause No. DC-2026-CV-0791 (the "Lubbock County Litigation"), asserting claims for breach of contract, declaratory judgment, breach of the duty of good faith and fair dealing, and breach of fiduciary duty arising from the NCAA's effort to enforce its eligibility rules against Sorsby.

60.     The Conference was not named as a party to the Lubbock County Litigation. It was not served with process and had no opportunity to be heard in the proceedings.

61.      On June 8, 2026, the 99th Judicial District Court entered a Temporary Injunction (the "Injunction"). The Injunction: (a) enjoined the NCAA from prohibiting Sorsby from practicing, playing, or otherwise participating on TTU's 2026 football team; and (b) enjoined enforcement of NCAA Bylaw 12.9.4.2 (the NCAA's Rule of Restitution related to eligibility violations) against Sorsby, TTU, any affiliate of TTU, any university that competes against TTU during the 2026 college football season, and any affiliate of any such university for complying with and relying on the Injunction.

62.      This action is not an attempt to challenge that Injunction, and this Court is not being asked to make any determinations related to Sorsby's eligibility to play college athletics or to the Conference's right to sanction Sorsby as an individual. The Injunction is a court order directed at the NCAA, governing the NCAA's enforcement of its own Bylaw 12.9.4.2 against Sorsby. Whatever the Injunction requires of the NCAA, it does not address the issues of the Conference's separate and independent governance authority over its Member Institutions. The Board's authority under Bylaw 3.6 to determine what conduct warrants sanctions is not limited to and does not depend on a violation of any NCAA (or even Conference) rule. If all of the NCAA eligibility rules went away today, the Conference would still have independent authority under its own Bylaws to regulate its Member Institutions, and determine whether the decisions they make with regard to student-athlete representatives in Conference competitions are consistent with Conference values and in the best interests of the Conference as a whole. This is the Conference's own contractual authority, governed by the Conference's own bylaws, and it exists wholly apart from anything the Lubbock County court has addressed or could address.

63.      Though the NCAA has appealed the Injunction and Sorsby could ultimately be determined ineligible, such determination may well happen after the conclusion of the upcoming

**COMPLAINT**                                                                                            **Page 19**

football season—if at all—as the trial date is not set until February of 2027. And even if Sorsby's eligibility is upheld, it does not change the Conference's authority on this issue. Whatever the ultimate outcome of the Lubbock County Litigation, the Conference's rights are not contingent on it. Thus, the Conference seeks a declaration and injunction with regard to its own freedom of expression and governance authority from this Court now, before the season begins, because doing otherwise would chill and suppress the Conference's speech and the harm to the Conference's interests from a season of unresolved uncertainty cannot be undone after the fact.

**TTU's Intent to Field Sorsby in its Football Games for the 2026-27 Season and the Desire of Big 12 Board Members to Hold Sanctions Vote**

64.     During the week prior to filing this Complaint, TTU communicated its intent directly to the Conference to field Sorsby in Conference football games. Though TTU has been asked by both the Conference and many University Presidents, Athletic Directors, and other representatives of Big 12 Member Institutions to choose not to field Sorsby in Conference competitions, TTU has not agreed to such requests.

65.     Members of the Big 12 Board of Directors have expressed a desire to the Conference to vote now on whether potential sanctions should be imposed if TTU follows through with its plan to field Sorsby in Conference competitions. There is considerable concern within the Conference, the Board, and the Member Institutions about (among other things) reputational harm, irreparable damage to public and Member trust in the integrity of Big 12 competitions, and the possibility that TTU could take a spot from another Member Institution in the Big 12 Championship Game with a player that has acted contrary to Conference rules and values and could ultimately be determined in the Lubbock County Litigation—*after* the Big 12 Championship—to have been ineligible for competition. Such harm would be irreparable to the Conference and its members.

66.    To this date, no vote on sanctions has taken place because of the legal uncertainty created by the Attorney General letters discussed below and the specific threat by the Texas Attorney General. If a vote were to occur, some of the potential sanctions the Board could consider under the Bylaws include monetary sanctions and/or a ban on competing in the Big 12 Championship Game.

67.    What the Conference must be able to decide and has authority to decide under its Bylaws, is whether, if TTU moves forward with its plan to field Sorsby in Conference games, including potentially Conference championship competition, such action is compatible with the Conference's repeatedly expressed institutional values and identity, those of its Member Institutions, the integrity of its competitions, and the potential that it will be viewed (incorrectly) to have expressed endorsement or at least tacit acceptance of speech and conduct by a Member Institution that strike at the heart of the Conference's moral and ethical values and judgments.

68.    When one Member Institution allows a student-athlete whose admitted conduct creates serious integrity concerns to compete in Conference games for Conference championships, the consequences extend beyond that institution. TTU's decision to associate with, if not endorse, a student-athlete in this manner will affect opposing schools, student-athletes, fans, broadcast partners, Conference standings, championship eligibility, and the public reputation of The Big 12 as a whole. As such, the Conference must be able to exercise its authority to enforce its Bylaws and impose appropriate institutional sanctions when Member conduct threatens the best interests and integrity of the Conference, particularly when the Conference is under threat of compulsion to associate with and condone values of a Member that the Conference does not itself hold.

69.    Notably, the Conference is not alone in its concern about what TTU's decision on this issue means for the integrity of Conference competition and the reputation of the Conference

**COMPLAINT**                                                                                    **Page 21**

and its Member Institutions. Within days of learning that Sorsby could play at TTU this year, athletic officials at the University of Georgia and the University of Nebraska sent department-wide memoranda instructing their coaches and athletic staff not to schedule TTU in any sport, and announcing that the schools may seek to cancel already-scheduled matchups. And the media firestorm of disapproval from across the college athletics industry over the prospect of TTU choosing to field Sorsby in the fall has been overwhelming.[5]

70.     In an industry that rarely agrees on anything, there is finally an issue that everyone seems to agree on (other than TTU and the Attorney General): universities should not field players who have bet on their own team's games in college athletics. These industry reactions reflect a rational institutional judgment shared by industry experts and institutions even outside the Conference that the presence of Sorsby's documented history in Conference games creates a cloud over the legitimacy of those games, a reputational risk for institutions that participate in them, and an unequal playing field for Member Institutions who are upholding the values of the Conference.

71.     Though the Conference does not fault TTU for supporting Sorsby's recovery, if TTU decides that support is going to extend to playing Sorsby in Conference competitions, the

---

[5] Austin Nivison, *Texas Tech athletic director defends actions on Brendan Sorsby as school shows no signs of backing down*, CBS Sports (June 10, 2026, at 16:24 ET), https://www.cbssports.com/college-football/news/brendan-sorsby-fallout-texas-tech-athletic-director-backlash/; Dan Wolken, *Texas Tech deserves more hate in Brendan Sorsby's sordid eligibility case*, Yahoo Sports (June 9, 2026, at 14:18 CT), https://sports.yahoo.com/college-football/article/texas-tech-deserves-more-hate-in-brendan-sorsbys-sordid-eligibility-case-191252725.html?guccounter=1; Pat Forde, *The Big 12 Must Stop the Brendan Sorsby Scam Before It Engulfs College Football*, Sports Illustrated (June 10, 2026), https://sports.yahoo.com/college-football/article/texas-tech-deserves-more-hate-in-brendan-sorsbys-sordid-eligibility-case-191252725.html?guccounter=1; Richard Johnson, *Texas Tech isn't protecting integrity – it's protecting its quarterback*, CBS Sports (June 11, 2026, at 11:30 ET), https://www.cbssports.com/college-football/news/texas-tech-isnt-protecting-integrity-its-protecting-its-quarterback/; Pete Thamel and Max Olson, *Coaches, Ads 'disgusted,' 'stunned' with Sorsby ruling*, ESPN (June 8, 2026, at 05:44 ET), https://www.espn.com/college-football/story/_/id/49003512/coaches-ads-disgusted-stunned-brendan-sorsby-ruling.

COMPLAINT                                                                        Page 22

Member Institutions—acting through their respective Board members—have the right and authority to determine whether certain sanctions against TTU for its decisions are appropriate or necessary.

**Letters From the Texas and Oklahoma Attorney Generals and The Ripe Controversy Before this Court**

72.     On June 11, 2026, while the Conference and its Board members were deliberating the appropriate next steps with regard to TTU, the Conference received a letter from the office of Attorney General Ken Paxton signed by Thomas D. York, Chief of the Antitrust Division of the Office of the Texas Attorney General, and Kimberly Gdula, Chief of the General Litigation Division of the Office of the Texas Attorney General ("Texas AG Letter"). The letter was addressed to Big 12 Commissioner Yormark and Board Chair Doug Girod (University of Kansas Chancellor) and is attached hereto as Exhibit 4.

73.     The Texas AG Letter demanded that the Conference refrain from exercising its governance authority, characterizing *any* invocation of Bylaw 3.6 as "a *per se* violation of federal and state antitrust laws—a naked horizontal agreement among competitors to disadvantage Texas Tech by cutting off access to the resources it needs to compete," and threatening joint and several liability of the Conference and its Member Institutions of "substantially more than $200 million." The Texas AG Letter further threatened claims for breach of contract and tortious interference arising from any Conference action affecting TTU's games and/or existing or potential commercial arrangements.

74.     The very next day (June 12, 2026), Oklahoma Attorney General Gentner Drummond sent a letter to Commissioner Yormark and Board Chair Girod responding directly to the Texas AG Letter (the "Oklahoma AG Letter"). The Oklahoma AG Letter is attached hereto as Exhibit 5. Attorney General Drummond wrote that Oklahoma has a direct interest in the integrity

<u>**COMPLAINT**</u>                                                                                                    **Page 23**

of Conference competition as the home state of Oklahoma State University, a Big 12 Member Institution. He characterized the Texas AG's antitrust claims as "meritless," stating that "[t]he idea that the Big 12 may not sanction the actions of one of its members under an agreed-upon preexisting contract is facially absurd."

75.     Attorney General Drummond's letter refuted the Texas AG's *per se* antitrust theory on the merits, citing controlling Supreme Court precedent: "[t]he Supreme Court has squarely rejected the letter's central premise that conference discipline amounts to a *per se* antitrust violation. Because horizontal cooperation among member institutions is essential to producing college athletics at all, restraints adopted by athletic associations are analyzed under the rule of reason." Ex. 5, at 1 (*citing NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100–03 (1984); *NCAA v. Alston*, 594 U.S. 69, 81–82 (2021)). He further noted that the Big 12 Conference, "like all intercollegiate athletic conferences, 'is a private association that adopts and enforces its own rules,' *NCAA v. Farrar*, 402 So. 3d 1251, 1264 (Miss. 2024)," and that the Conference's enforcement of its bylaws is "'upholding integrity and fair play among [its] membership,'" not "causing damage and loss" to TTU.

76.     Lastly, Attorney General Drummond recommended that the Conference take action against TTU under Bylaw 3.6, describing TTU's conduct as "a shameful chapter in the story of college football" and stating that TTU has "acted in a manner adverse to the Big 12 and the integrity of college football as a whole."

77.     These letters illustrate not only the importance of these issues for the Big 12's Member Institutions and their home states, but also the need to have these issues addressed by this Court given the competing opinions on the application of federal law being communicated to the Conference by Attorneys General in different states. Further, the competing letters from the

Attorneys General of Texas and Oklahoma make the controversy before this Court concrete, actual, and immediate. The Texas AG has threatened significant and punitive liability if the Conference exercises its governance authority by seeking to disassociate from TTU's association with and speech about values with which the Conference disagrees. The Oklahoma AG has concluded that the Texas AG's legal theory is meritless and recommended that the Conference take action against TTU.

78.     Without a judicial declaration clarifying the Conference's rights, the Conference faces an impossible choice: abandon its governance authority under governmental compulsion (in favor of one state's authority but contrary to the recommendations of another), or exercise its authority and face threatened enforcement action that the Texas Attorney General claims would expose the Conference and its members to significant liability.

## CLAIMS FOR RELIEF

### Count I: For Declaratory and Injunctive Relief
### Based on Violations of the First Amendment
### (U.S. Const. amend. I, 42 U.S.C. § 1983)

79.     The Big 12 incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

80.     The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 749 n.1 (1976).

81.     The Supreme Court "ha[s] long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in

pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000).

82.     Just as freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) the "[f]reedom of association . . . plainly presupposes a freedom not to associate," *Roberts*, 468 U.S. at 623. After all, "[f]orcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express." *Dale*, 530 U.S. at 648; *see also Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 680 (2010) ("*Who* speaks . . . colors *what* concept is conveyed."). In Justice Jackson's famous words, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion *or force citizens to confess by word or act their faith therein*." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added).

83.     Freedom of association "protect[s] not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) (cleaned up). That protection thus extends beyond "direct limits" to "adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Indeed, "[a]ny form of official retaliation . . . , including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of [the] freedom" of association. *Izen v. Catalina*, 398 F.3d 363, 367 n.5 (5th Cir. 2005); *see NRA of Am. v. Vullo*, 602 U.S. 175, 180 (2024)

(reaffirming that "a government entity's 'threat of invoking legal sanctions and other means of coercion' . . . 'to achieve the suppression' of disfavored speech violates the First Amendment" (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963))); *Hall v. Merola*, 67 F.4th 1282, 1294 (11th Cir. 2023) ("[A] First Amendment retaliation claim can use any sort of adverse action [including] a civil lawsuit . . . .").

84.    The Big 12 engages in "expressive association," *Dale*, 530 U.S. at 648: the Conference has repeatedly expressed that sports betting by athletes is anathema to its ethical values and institutional mission. Such betting is inconsistent with the rules and policies governing the Conference and its Member Institutions; for example, the Conference's sports betting policy declares that "[t]he Big 12 Conference is committed to maintaining the integrity of the Big 12 competitions and that of its members, student-athletes, coaches, and staff." Ex. 2. "Sports wagering has the potential to undermine the integrity of sports competitions and jeopardize the well-being of student-athletes and the intercollegiate athletics community. It also demeans the competition and competitors alike *by spreading a message that is contrary to the purpose and meaning of 'sport.'*" (emphasis added). *Id*.

85.    This stance is of a piece with the Conference's broader commitment to sportsmanship, fair play, and ethics in sports. For example, in its Sportsmanship Statement, the Big 12 declares that its member institutions "are committed to competition in an arena where sportsmanship and the sense of fair play take center stage," and "[w]hether on the field, *within the community* or in the classroom, those who make up the Big 12—its administrators, coaches, game officials, and student-athletes—support the highest ideals in sportsmanship." *Sportsmanship Statement*, Big 12 Conference, https://shorturl.at/08cCP (last visited June 13, 2026) (emphasis added). The Conference's published Bylaws have an entire section on "Sportsmanship and Ethical

**COMPLAINT**                                                                                           **Page 27**

Conduct," in which the Big 12 states that "essential elements of character-building and ethics in sports are embodied in the concept of sportsmanship and six core principles: trustworthiness, respect, responsibility, fairness, caring, and good citizenship." Ex. 3, Bylaws § 11.1. And the Conference represents to the public, including potential student-athletes and its commercial partners, that it is "dedicated to upholding the principles for conduct of intercollegiate athletics" and "preserving the integrity of Division I collegiate athletics." *Big 12 Conference Compliance*, Big 12 Conference, https://shorturl.at/HvubL (last visited June 13, 2026).

86.    The Conference's stated views are consistent with longstanding public expressions by ethicists and sports associations about the risks that sports betting, especially by participants in a game, will compromise the integrity of athletic competitions. *See*, *e.g.*, Lance Pugmire, *NFL Suspensions and the Need to Protect Integrity of Sport*, LA Times (Mar. 21, 2012, 12 A.M. P.T.), https://shorturl.at/0mRk4 (discussing Major League Baseball's suspensions of Chicago White Sox players for betting on 1919 World Series games in which they participated and ban of Pete Rose for life for betting on the team he managed, and quoting ethicist Michael Josephson, founder of the Josephson Institute of Ethics—from which the Big 12 drew its six core principles of sportsmanship—as saying "[t]hose gambling cases had the capacity to destroy the game by making the public believe the outcomes were no longer on the up and up"); Josephson Institute of Ethics, Character Counts!, *Changing Cheaters: Promoting Integrity & Preventing Academic Dishonesty: A Resource for Teachers, Parents, Coaches and Others Who Work With Youth* 13 ¶ 11 (May 2004).

87.    Recent examples confirm that these views about sports betting's potential threat to integrity cannot be chalked up to a bygone era before betting became more broadly legalized.

    a.    Earlier this year, for example, Major League Soccer banned two players for betting on, *inter alia*, their own matches, emphasizing the importance of the measure "to

protect the integrity of our competition for clubs, players, and fans." *Derrick Jones and Yaw Yeboah Issued Lifetime Suspensions from MLS for Betting on MLS Matches*, Major League Soccer (Mar. 9, 2026, 3:00 P.M.), https://shorturl.at/DtQ6S.

b. Similarly, Major League Baseball ruled a player permanently ineligible in 2024 for having bet on games, with its Commissioner stating, "The strict enforcement of Major League Baseball's rules and policies governing gambling conduct is a critical component of upholding our most important priority: protecting the integrity of our games for the fans." Mark Feinsand, *MLB Announces Sports Betting Suspensions for 5 Players* (June 4, 2024), https://shorturl.at/Xr16Q.

c. The NBA did likewise in 2024. *See Jontay Porter Banned from NBA for Violating League's Gaming Rules*, NBA (Apr. 17, 2024 12:50 PM), https://shorturl.at/AL6EF.

d. And the same year, after an internal investigation found pervasive sports betting by a team on its own competitions, Notre Dame University suspended its entire men's swimming program for a year, emphasizing "our obligation to foster a community of student-athletes who not only compete and perform at the highest level academically and athletically, b*ut whose conduct reflects the University's values*." Pete Bevacqua, *Men's Swimming Program Suspended For a Minimum of One Academic Year* (Aug. 15, 2024) (emphasis added), https://shorturl.at/fqJdV.

e. In 2022, the NFL suspended a player indefinitely and at least for an entire season for betting on games even while away from the team, with the league's commissioner stressing that the player's actions "put the integrity of the game at

risk, threatened to damage public confidence in professional football, and potentially undermined the reputations of your fellow players throughout the NFL." Kevin Patra, *Falcons WR Calvin Ridley Suspended Indefinitely Through at Least 2022 Season for Betting on NFL Games* (Mar 07, 2022, 03:41 PM), https://shorturl.at/KKCyK.

88.     Against this backdrop, the Conference seeks to hold a vote on potential sanctions of TTU pursuant to § 3.6 of its Bylaws because of TTU's tacit endorsement of and association with Sorsby's unethical and illegal betting—and the Conference's unwillingness to condone or associate with that behavior or be seen as such. Yet in retaliation the Attorney General and TTU now perversely wish to prohibit the Big 12 from imposing *any* sanctions and have threatened to bring suit against the Conference to deter or compel that result. In so doing, they are "significantly affect[ing]" the Conference's ability to exercise its right to express disagreement with Sorsby's conduct, to associate with its member institutions to that end, and to disassociate with Sorsby for his conduct. *Dale*, 530 U.S. at 650. The First Amendment does not permit such an attempt by governmental officials to "do indirectly what [they are] barred from doing directly." *NRA*, 602 U.S. at 190.

89.     The Attorney General and TTU's attacks on the Big 12's freedom of expressive association are not only unjustified and unconstitutional, but they are most hypocritical in light of their own prior expressions on the subject at issue here. The Attorney General, the State more broadly, and TTU each have purported to claim that the very expressive values that the Big 12 attempts to uphold here are their own. For example, although sports betting has proliferated in the United States in recent years, the State of Texas still prohibits and criminalizes the practice. *See* Tex. Penal Code § 47.02(a)(1). The Attorney General has long taken the position that the best

reading of Texas law is that even "participation in daily fantasy sports leagues is illegal gambling under section 47.02 of the Penal Code." Paxton, Op. No. KP-0057, *supra* ¶ 55.[6]

90.     Similarly, TTU makes "gambling, wagering, gaming and bookmaking" "prohibited on University premises involving the use of University equipment or services." Texas Tech Univ., *Student Code 2025–2026* § B Misconduct ¶ 9, https://shorturl.at/OcVox (last visited June 13, 2026). Students who engage in sufficiently severe, persistent, or pervasive misconduct face potential expulsion for even a first offense. *See General Conduct Sanctions Grid*, Texas Tech Univ., https://shorturl.at/PW9IX (last visited June 13, 2026). TTU further emphasizes sports betting prohibitions in its student-athlete handbook. *See* Texas Tech Univ., *2021–2022 Marsha Sharp Center for Student-Athletes Handbook*, https://shorturl.at/nEf0h (last visited June 13, 2026). Thus, by all outward appearances, the State has no interest contrary to the expressive one held by the Big 12.

91.     Thus, the State and TTU have engaged in, and threatened to engage in, efforts to prevent or coerce the Big 12 from exercising its freedom of expression and expressive association rights in violation of the First Amendment.

**Count II: For Declaratory Relief that Sanctions by the Big 12 on TTU Do Not Violate Section 1 of the Sherman Act**

92.     The Big 12 incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

93.     This claim is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain a declaration that sanctions by the Big 12 against TTU under § 3.6 of the

---

[6] These interpretations prompted a leading provider of such fantasy sports leagues to bring suit against the Attorney General. *See DraftKings,Inc. v. Paxton*, No. D-1-GN-18-1856 (Tex. Dist. Ct., Travis Cty.).

Bylaws do not violate the antitrust laws, let alone constitute a *per se* violation of the Sherman Act as the Attorney General has contended.

94.     The Attorney General asserts that the Big 12 will commit *per se* antitrust violations if it sanctions TTU in any way. *See* Texas AG Letter at 1 ("Any sanction against Texas Tech . . . would be a per se violation of federal and state antitrust laws."). According to the Attorney General, the Big 12—an entirely lawful association in which TTU participates including by voting for sanctions against a different member institution—[7]cannot impose any sanction against a member for voluntarily choosing to play a student who has acted contrary to the values, policies, and rules of the Conference, and violated the rules of TTU itself, and the NCAA, as well as myriad state laws, and thereby undercut the very essence of fair competition.

95.     To be sure, given the result in the NCAA injunctive relief case, TTU can choose whether or not to compete with Sorsby. And TTU can pay him consistent with the law. But the freedom to do so is by no means a freedom from consequences. It is well within the right of the Big 12 to discern and implement an appropriate sanction in response to TTU's decision to compete with a student-athlete who has extensively, unethically, and unlawfully bet on college football.

96.     In this regard, as the Attorney General and TTU know full well, conference sanctions for unlawful and unethical conduct do not violate the antitrust laws. *See, e.g., Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (dismissing antitrust claims as outside of the ambit of the Sherman Act where the sanctioned plaintiff, among other things, committed academic fraud).

---

[7] *See* Marc Tracy, *Big 12 Penalizes Baylor Over Handling of Sexual Assault Cases*, N.Y. Times (Feb. 8, 2017), https://www.nytimes.com/2017/02/08/sports/football/baylor-big-12-revenue-sexual-assault.html (reporting that the Big 12 "board of directors had voted unanimously to withhold" "millions of dollars in conference revenue from Baylor until an outside review determined that the athletic department was complying with Title IX guidelines and other regulations in the wake of a sexual-assault scandal").

**COMPLAINT**                                                                                           **Page 32**

97.     Even if TTU and the Attorney General could establish the kind of conduct (and joint commercial conduct) that fell within the ambit of the Sherman Act (and they cannot), any such claim would fail at the outset for lack of antitrust standing. Antitrust plaintiffs (or the persons whom they represent) must have suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). It is not enough that a plaintiff was excluded or suffered economic harm; rather, the plaintiff must allege injury flowing from the anticompetitive nature of the challenged conduct, not merely from its impact on the plaintiff. *Balaklaw v. Lovell*, 14 F.3d 793, 797–802 (2d Cir. 1994).

98.     In other words, market participants lack antitrust standing unless their harm "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *see Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 334 (3d Cir. 2018) (no antitrust standing where plaintiff cannot credibly allege "a negative impact on consumers or to competition in general"); *see also Norris v. Hearst Tr.*, 500 F.3d 454, 466 (5th Cir. 2007).

99.     Here, the Attorney General's letter confirms that it seeks to prevent purported (and altogether dubious) losses stemming from "Texas Tech's lost football revenues, damages to its alumni contributions and damages to its recruitment." Letter at 2. This sort of purported derivative harm is not antitrust injury. It is harm that allegedly would flow from TTU's agreement with the Big 12 and its decision to permit Sorsby to play in Conference competitions despite his admitted unlawful and unethical conduct. This is not harm to competition at large; it is harm to one school that has determined to jettison concerns about Texas state law and its own code of conduct, among many other moral and legal standards. Accordingly, TTU would lack any antitrust injury.

100.     Nor could the Attorney General or TTU establish a *per se* antitrust violation, as the Attorney General suggests. According to the Attorney General, "[a]ny sanction against Texas Tech for acting consistent with the Order would be a per se violation of federal and state antitrust laws— a naked horizontal agreement among competitors to disadvantage Texas Tech by cutting off access to the resources it needs to compete." Texas AG Letter. That is not the law.

101.     "Determining whether a restraint is undue for purposes of the Sherman Act presumptively calls for what [the Supreme Court] ha[s] described as a rule of reason analysis." *Alston*, 594 U.S. at 81.

102.     Conversely, the *per se* rule may be applied only when "conduct [is] so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand." *Marucci Sports v. NCAA,* 751 F. 3d 368 (5th Cir. 2014); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Imposing sanctions on the conduct of a member of a lawful organization under established rules has not been deemed to be "pernicious and devoid of redeeming virtue." Just the opposite.

103.     Courts considering NCAA and athletic conference rules apply the rule of reason, not the *per se* rule. *See Alston*, 594 U.S. at 88; *O'Bannon v. NCAA*, 802 F.3d 1049, 1069 (9th Cir. 2015) ("[W]e are persuaded—as was the Supreme Court in *Board of Regents* and the district court here—that the appropriate rule is the Rule of Reason.); *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 103 (rejecting the *per se* rule when reviewing trade restraints imposed by sports leagues); *McCormack v. NCAA*, 845 F.2d 1338, 1343 (5th Cir. 1988) (same).

104.     Separate and apart from the long history applying the rule of reason to NCAA and conference rules, courts have repeatedly upheld disciplinary actions designed to preserve integrity, competitive balance, and organizational standards rather than confer economic advantages on

competitors. By way of example, one court recently found that the NCAA members adopted and enforced its bylaws "in furtherance of the NCAA's mission to 'uphold integrity and fair play among the NCAA membership, and to prescribe appropriate and fair penalties if violations occur' and 'ensure that those institutions and student-athletes abiding by the NCAA constitution and bylaws are not disadvantaged by their commitment to compliance.'" *Farrar*, 402 So. 3d at 1264.

105.   Associations cannot function without rules, membership criteria, and disciplinary procedures, and the antitrust laws recognize that such measures may incidentally restrain trade without restraining competition. The Big 12, "like many other athletic organizations, creates 'agreement[s] among competitors on the way in which they will compete with one another,'" which allow the conference "to develop rules to promote uniform and fair gameplay—essential cooperation without which college sports would not exist in their current form." *Robinson v. NCAA*, 172 F.4th 271, 279 (4th Cir. 2026); *see also Alston*, 594 U.S. at 90 (explaining that "some degree of coordination between competitors within sports leagues can be procompetitive. Without some agreement among rivals . . . the very competitions that consumers value would not be possible").

106.   For these reasons, courts examine whether the allegedly collective action was intended to accomplish a legitimate goal of self-regulation and whether the challenged action was reasonably related to that goal. *See, e.g.*, *Blubaugh v. Am. Contract Bridge League*, No. IP 01-358-C H/K, 2004 WL 392930, at *17 (S.D. Ind. Feb. 18, 2004), *aff'd,* 117 F. App'x 475 (7th Cir. 2004) (finding that because "[f]acially neutral rules that prohibit cheating are essential to promote fair competition and to preserve the integrity of the game," they are an "obvious" procompetitive justification).

**COMPLAINT**                                                                                          **Page 35**

107. In short, this case involves legitimate and routine association governance, rule enforcement, and self-regulation—not the sort of naked agreement among competitors that remotely could support *per se* condemnation. *See Alston*, 594 U.S. at 90.

108. Mindful of the uninterrupted line of decisions that NCAA and conference rules must be examined under the rule of reason, the Attorney General pins its hopes on an unpublished decision from the Ninth Circuit regarding a rule imposed by an international governing body for professional swimmers to prevent competition. *See generally, Shields v. World Aquatics*, No. 23-15092, 2024 WL 4211477 (9th Cir. Sept. 17, 2024). The rule at issue there prohibited member federations from affiliating with competitive organizations, and did not involve the sort of unremarkable sanctions at issue here related to unethical and unlawful conduct impairing fair sport and competition.

109. The explanation in *Shields* as to when the *per se* rule might apply confirms it does not apply here. There, the Ninth Circuit explained that it could apply the *per se* rule to an alleged boycott when "competitors enter into a horizontal agreement" with "no purpose other than disadvantaging the target." *Id.* at *1. The decisions made recently by TTU have garnered expansive and intense negative reactions and undermine the core of fair and honest play in college athletics. *See infra*. It would be absurd in the extreme to suggest that sanctions here would have "no purpose other than disadvantaging the target." *Shields*, 2024 WL 4211477, at *1.

110. The other potential scenarios in *Shields* are of no more help to the Attorney General and TTU. *Id.* The Big 12 is considering potential sanctions for conduct that has been widely condemned across political, competitive and geographic lines—*not* engaging in any "boycott." Nor does the Big 12 possess a dominant share in any properly-defined market, *see Choh v. Brown Univ.*, No. 24-2826, 2026 WL 1210124, at *3 (2d Cir. May 1, 2026) (summary order), or threaten

to "cut off access to a supply, facility, or market necessary to enable [TTU] . . . to compete." *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 690 (9th Cir. 2022). The Big 12 sanctioning TTU in accordance with the Conference's agreed-upon framework and rules is not remotely anti-competitive and, if anything, would enhance competition and instill consumer confidence by supporting and honoring fair play. And, to be sure, if TTU chose not to play Sorsby, they have and could have myriad highly-regarded other players (who have not engaged in illegal and anti-competitive conduct) to help them compete and do so vigorously.[8] In sum, TTU is not the subject of a boycott and not being "cut-off" from anything, other than the consequences of their unfortunate (and recent) abandonment of principles enshrined in Texas state law and TTU's rules.

111.   In sum, the *per se* rule has no place here. If TTU and Texas AG were deemed to have a potential antitrust claim (and there are numerous gating hurdles even to get to that point), any such claim would be considered under the Rule of Reason. *Alston*, 594 U.S. at 80. But any such claim would fail for numerous reasons, including a failure and inability to define a relevant market or to establish substantial anticompetitive and market-wide effects that harm consumers in the relevant market. *See generally Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 442 (5th Cir. 2026); *Choh*, 2026 WL 1210124, at *2 (summary order); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *LifeWatch Servs. v. Highmark, Inc.*, 902 F.3d 323, 336 (3d Cir 2018)

112.   In light of the above and for myriad other reasons, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the Court should declare that sanctions imposed pursuant to § 3.6 of the Big 12 Bylaws do not violate Section 1 of the Sherman Act. The Big 12, the State AG, and TTU are engaged in an actual controversy concerning the legality of the Big 12's anticipated

---

[8] The Texas Tech roster lists five other quarterbacks with impressive statistics and experience. https://texastech.com/sports/football/roster.

sanctions. Where, as here, the parties have adverse legal interests and their dispute is sufficiently immediate and real to warrant judicial resolution, the court can issue a declaratory judgment. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

113.    An actual and immediate controversy exists regarding whether sanctions imposed under § 3.6 of the Big 12 Bylaws would violate Section 1 of the Sherman Act. This dispute is neither hypothetical nor speculative. The Texas Attorney General has preemptively and expressly threatened the Conference and its members with substantial antitrust liability with exposure to treble damages and attorneys' fees exceeding $200 million. Those allegations create precisely the sort of concrete and immediate controversy that the Declaratory Judgment Act is designed to resolve before a party must either abandon contemplated conduct or proceed under the threat of litigation.

114.    Declaratory relief is also appropriate here because the Big 12 does not want a "speculative" advisory opinion; instead, it "seeks, in essence, a declaratory judgment holding that it may evaluate and assess limits . . . without violating the antitrust laws." *See NBA v. SDC Basketball Club, Inc.*, 815 F.2d 562 (9th Cir. 1987) (finding an actual controversy where a sports league faced antitrust threats concerning contemplated league action).

115.    The Complaint therefore adequately pleads a claim for declaratory relief. It identifies the specific conduct at issue, the Conference rule authorizing that conduct, the parties asserting adverse legal positions, and the Attorney General's express threat that implementation of the contemplated sanctions would violate federal antitrust law and result in substantial liability. Accordingly, the Big 12 need not wait to impose sanctions, incur substantial liability, and then defend against the very antitrust claims the Attorney General has already threatened to bring.

Declaratory relief here will resolve a real and immediate dispute and clarify the parties' rights before such litigation arises.

116.    For these and other reasons, the Court should declare that sanctions by the Big 12 against TTU under its established authority would not constitute a *per se* violation of Section 1 of the Sherman Act, and that they would not violate Section 1 of the Sherman Act at all.[9]

### Count III: For Declaratory and Injunctive Relief
### Based on Violations of the Commerce Clause, U.S. Const. art. I, § 8 cl. 3, 42 U.S.C. § 1983

117.    The Big 12 incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

118.    The Constitution's Commerce Clause gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The "dormant" Commerce Clause prohibits States and their political subdivisions from adopting laws that discriminate against interstate commerce. *See Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 368 (2023); ; *see id.* at 377 ("[A] law's practical effects may also disclose the presence of a discriminatory purpose"). The dormant Commerce Clause forbids "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369.

---

[9] The Letter also asserts that sanctions against Texas Tech would violate Section 15.05(a) of the Texas Free Enterprise and Antitrust Act (the "TFEA"). The TFEA claim would fare no better than any claim under the Sherman Act. TFEA is "comparable to, and indeed taken from" Section 1 of the Sherman Act. *AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC*, 638 S.W.3d 198, 206 (Tex. 2022). And the TFEA provides that it "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes." Tex. Bus. & Com. Code § 15.04. Texas courts thus "look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a)." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990); *see also AMC Ent.*, 638 S.W.3d at 206–07.

<u>COMPLAINT</u>                                                                                          **Page 39**

119. There is no question that interstate commerce is at issue here, including in the Bylaws whose effect the Attorney General seeks to nullify. The Bylaws are an interstate contract among the Conference and its member institutions, which are located across the country, including in Arizona, Colorado, Florida, Iowa, Kansas, and other States. Through that contract, the members have agreed upon a common set of rules—governing eligibility, competition, sportsmanship, and discipline—that apply uniformly nationwide and that the members have entrusted the Conference to administer and enforce to facilitate interstate athletic competition.

120. The commerce that these Bylaws help facilitate is enormous. The Conference and its members generate and distribute hundreds of millions of dollars in media-rights revenue, ticket sales, sponsorships, and related commercial activity across state lines; hold competitions that require teams, officials, and broadcasts to cross state borders; and compete nationally for revenue, recruits, and recognition. The eligibility and disciplinary rules embodied in the Bylaws directly govern the terms on which that interstate competition occurs.

121. Chief among the disciplinary mechanisms the members adopted—as the Attorney General's June 11, 2016 letter recognizes—is the authority under § 3.6 to sanction a member that has engaged in conduct adverse to the Conference, including a member that retains and fields a student-athlete in violation of the sports betting rules and policies governing the Conference and its Member Institutions.

122. Here, however, the Attorney General threatens to use the law to prohibit the Conference from enforcing the disciplinary provisions of its own multistate agreement against TTU, a Texas institution. The practical effect of this would be to nullify those rules or to force all the Big 12's members to conform to Texas's as-yet-undefined rule that the Attorney General would leave in its place. *See NCAA v. Miller*, 10 F.3d 633, 638–40 (9th Cir. 1993) (invalidating on

Commerce Clause grounds a state rule that would have imposed on national collegiate athletic associations enforcement procedures different from those the association applied nationwide); *id.* at 639 ("In order to avoid liability under the Statute, the NCAA would be forced to adopt Nevada's procedural rules for Nevada schools. Therefore, if the NCAA wished to have the uniform enforcement procedures that it needs to accomplish its fundamental goals and to simultaneously avoid liability under the Statute, it would have to apply Nevada's procedures to enforcement proceedings throughout the country."). In doing so, moreover, the Attorney General would confer a competitive benefit on a Texas institution while discriminating against and unduly burdening the Conference's overwhelmingly out-of-state members. Out-of-state members will lose the benefit of the bargain they struck in the Bylaws and suffer the competitive and reputational consequences of an interstate agreement that one State has effectively nullified in favor of its own institution.

123.   That discrimination is not incidental; it is the purpose and central effect of the Attorney General's threat. The Attorney General's threat is transparently protectionist, with a Texas institution seeking to retain a competitive advantage that the Bylaws forbid, and the advantage is at the expense of institutions in other States. But a single State cannot nullify, as to its own favored in-state institution, the uniform rules of an interstate agreement while leaving those rules in force against everyone else. This form of economic protectionism runs afoul of the Commerce Clause.

124.   Even if the Attorney General were acting in a nondiscriminatory manner, the burden the Attorney General's actions would impose on interstate commerce are clearly excessive in relation to any putative local benefit. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

125.   The Attorney General seeks to dictate the eligibility and disciplinary rules of an athletic conference with membership and competitions across the country. Again, by compelling

the Conference to refrain from enforcing a uniform rule that applies among interstate members, Texas would in practical effect set conference-wide policy—governing competitions staged in other States, between institutions of other States—from within its own borders. The Conference cannot apply its disciplinary rules differently in Texas than elsewhere; the rules are uniform by design and by contract among parties dispersed across state lines. The necessary consequence of the threatened enforcement is therefore the projection of one State's newly announced policy across the entire multistate enterprise.

126. That burden is substantial and clearly excessive in relation to any legitimate local interest. Whatever interest the Attorney General may assert in the application of state (and federal) antitrust laws or yet undefined principles of state contract and tort law, that interest does not justify disabling the agreed disciplinary framework of a nationwide contract and thereby overriding the competitive expectations of institutions across the country. The practical effect of the threatened enforcement is to impose on interstate commerce a burden out of all proportion to the local interest asserted (a dubious local interest at that, *see supra* ¶¶ 43, 90 (discussing Texas's prior stated interests)). *Cf. Nat'l Pork Producers*, 598 U.S. 356.

### Count IV: For Declaratory Relief Against TTU Based on Governance Rights Under the Bylaws (Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202)

127. The Big 12 incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

128. The federal Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

129.    A justiciable controversy exists as to the rights and status of the Big 12 under its governance and contractual relationship with TTU. The Attorney General and TTU have threatened imminent litigation for breach of contract if the Big 12 exercises its authority under its Bylaws to impose sanctions on TTU, a Member Institution. Ex. 4. The threat of imminent litigation absent resolution of the parties' contractual rights presents a justiciable controversy. *See MedImmune*, 549 U.S. at 129 ("The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." (quotations omitted)).

130.    TTU is a voluntary member of the Big 12 and is bound by the Conference Bylaws, Rules, regulations, and governance procedures adopted by the Big 12's Board of Directors. Those governing documents define the rights and obligations of the Big 12 and its member institutions, including TTU.

131.    The Conference Bylaws expressly authorize the Big 12, acting through the required vote by a supermajority of Disinterested Directors, to determine whether a member institution has engaged in conduct warranting sanctions and, if so, to impose sanctions on that member institution.

132.    The Big 12 Bylaws grant the Board broad discretion to impose sanctions on a Member Institution. Specifically, Bylaw 3.6 provides that a supermajority of Disinterested Directors, may impose sanctions, in its "sole discretion" on a Member Institution if it determines that a "Member has: (i) violated any provision of these Bylaws or the Rules and other regulations established from time to time by the Board of Directors that govern the Conference or the Grant of Rights Agreement; (ii) engaged in any action or a course of conduct materially adverse to the best interests of the Conference taken as a whole; . . . or (iv) otherwise taken any action or omitted

to take an action that the Supermajority of Disinterested Directors determines merits Sanctions." Ex. 3.

133.    Under Texas law, a party raising a breach of contract claim must establish "(1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 185 (Tex. App.—Dallas 2013, pet. denied).

134.    Texas law recognizes that a party does not breach a contract by exercising rights expressly reserved to it under the contract. *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 191 (5th Cir. 2007) (plaintiff cannot show that defendant breached the terms of a contract by "exercising rights clearly reserved to it by the [contract]'s plain language."); *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) ("as a matter of law," a party does not breach by exercising its express contractual rights); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554. 557–58 (Del. 2014) (the bylaws of a Delaware nonstock membership corporation are part of the contractual framework binding the corporation and its members and are enforceable if consistent with law and the certificate of incorporation).

135.    The Conference Bylaws expressly reserve to the Big 12 the authority to determine, through the required vote of Disinterested Directors, whether a member institution's conduct warrants sanctions and to impose sanctions consistent with the Bylaws.

136.    Accordingly, should the Big 12 impose sanctions on TTU pursuant to and consistent with the authority, standards, and procedures set forth in Bylaw 3.6 and the Conference's governing documents, the Big 12 would be exercising its express contractual rights

**COMPLAINT**                                                                                                 **Page 44**

and would not breach any contract with TTU merely by imposing such sanctions. Such sanctions cannot give rise to a breach of contract claim.

137.    The Big 12 therefore requests that the Court enter declaratory judgment in its favor and against TTU as set forth above.

**PRAYER FOR RELIEF**

The Big 12 asks for judgment against Defendants that will provide declaratory and injunctive relief including but not limited to the following:

**A.  Declaratory Relief.**

1.  A declaratory judgment that the First Amendment protects the Conference's right to invoke its authority under its Bylaws to sanction TTU related to its handling of the sports betting activity discussed in this Complaint, including if TTU fields a student-athlete in Big 12 competitions who has engaged in collegiate sports betting activity.

2.  A declaratory judgment that imposing such sanctions is not a per se violation of Section 1 of the Sherman Act.

3.  A declaratory judgment that the Attorney General's threatened use of the law to prohibit the imposition of such sanctions violates the dormant Commerce Clause.

4.  A declaratory judgment that:

    a.  Bylaw 3.6 authorizes the Big 12, acting through the required vote of a Supermajority of Disinterested Directors, to determine, after TTU has had notice and an opportunity to be heard, whether TTU has engaged in conduct warranting sanctions;

    b.  Bylaw 3.6 authorizes the Big 12, acting through the required vote of a Supermajority of Disinterested Directors, to impose sanctions on TTU if the

Supermajority of Disinterested Directors determine that sanctions are warranted under the Bylaws; and

c. the Big 12 would not breach the Bylaws or any other contract with TTU by imposing sanctions on TTU pursuant to and consistent with this authority, standards, and procedures set forth in Bylaw 3.6 and the Conference's governing documents.

**B. Injunctive Relief.**

1. A preliminary injunction and a permanent injunction barring Defendants from seeking to deter, coerce, prevent, or punish the Big 12 for exercising its rights under its Bylaws to sanction TTU related to its handling of the sports betting activity discussed in this Complaint, including if TTU fields a student-athlete in Big 12 competitions who has engaged in collegiate sports betting activity.

**C. Costs and Attorneys' Fees.** Costs and attorneys' fees pursuant to any applicable statute or authority, including 42 U.S.C. § 1988.

June 14, 2026                                              Respectfully submitted,

/s/ *Natali Wyson*

Benjamin R. Nagin (*pro hac vice*          Natali Wyson (TX Bar No. 24088689)
  forthcoming; NY Bar No. 2837078)         Margaret H. Allen (TX Bar No. 24045397)
Eamon P. Joyce (*pro hac vice* forthcoming;  Christopher J. Van Slyke (TX Bar No.
  NY Bar No. 4104865)                         24143480)
SIDLEY AUSTIN LLP                          SIDLEY AUSTIN LLP
787 Seventh Avenue                         2323 Cedar Springs, Suite 2600
New York, NY 10019                         Dallas, TX 75201
Tel.: 212.839.5300                         Tel.: 214.981.3300
Fax.: 212.839.5599                         Fax.: 214.981.3400
bnagin@sidley.com                          margaret.allen@sidley.com
ejoyce@sidley.com                          nwyson@sidley.com
                                           christopher.vanslyke@sidley.com

Jacob Steinberg-Otter (*pro hac vice*
  forthcoming; D.C. Bar No. 90003886)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Tel.: 202.736.8000
Fax.: 202.736.8711
jacob.steinbergotter@sidley.com

### *COUNSEL FOR PLAINTIFF THE BIG 12 CONFERENCE, INC.*